# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# FORT WAYNE DIVISION

| | |
|---|---|
| STEVEN L. MINNIEFIELD, JR., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CAUSE NO.: 1:09-cv-35 |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## OPINION AND ORDER

Plaintiff Steven L. Minniefield, Jr. appeals to the district court from a final decision of the Commissioner of Social Security ("Commissioner") denying his application under the Social Security Act (the "Act") for Disability Insurance Benefits ("DIB").[1] (*See* Docket # 1.) For the following reasons, the Commissioner's decision will be REVERSED and the case will be REMANDED to the Commissioner for further proceedings in accordance with this Opinion.

## I. PROCEDURAL HISTORY

Minniefield applied for DIB on June 30, 2003, alleging that he became disabled as of March 15, 2002. (Tr. 18.) The Commissioner denied his application initially and upon reconsideration, and Minniefield requested an administrative hearing. (Tr. 47-49, 53-57.) Administrative Law Judge ("ALJ") Bryan Bernstein conducted a hearing on December 14, 2006, at which Minniefield, who was represented by counsel; Harriet Angela Jones, the claimant's fiancé; and Charles McBee, a vocational expert ("VE") testified. (Tr. 785-813.)

On June 14, 2007, the ALJ rendered an unfavorable decision to Minniefield. The ALJ concluded that although Minniefield was under a disability, he was not legally disabled because

---

[1] All parties have consented to the Magistrate Judge. *See* 28 U.S.C. § 636(c).

his substance abuse was a contributing factor material to the determination of disability. (Tr. 18-29.) The ALJ also found that Minniefield's symptoms were exacerbated by his lack of compliance with his treatment regime. (Tr. 23.) The Appeals Council denied Minniefield's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 5-7.) Minniefield filed a complaint with this Court on February 6, 2009, seeking relief from the Commissioner's final decision. (Docket # 1.) Minniefield's sole argument on appeal is that the ALJ improperly evaluated his mental Residual Functional Capacity (Opening Br. of Pl. in Social Security Appeal Pursuant to L.R. 7.3 ("Br.") 9-11.)

## II. FACTUAL BACKGROUND[2]

### A. Background

Minniefield was born on October 8, 1973 and is therefore classified as a Younger Individual for his entire period of alleged disability. (Tr. 65.) He has a high school education (Tr. 79) and past work experience as a cook, materials loader, forklift operator, and tractor trailer driver. (Tr. 808.) Minniefield alleges that he became disabled due to paranoid schizophrenia.[3] (Br. 2.)

---

[2] In the interest of brevity, this Opinion recounts only the portions of the 800-page administrative record necessary to the decision.

[3] "The essential features of schizophrenia are a mixture of characteristic signs and symptoms (both positive and negative) that have been present for a significant portion of time during a one month period (or for a shorter time if successfully treated), with some signs of the disorder persisting for at least six months. Characteristic symptoms may be conceptualized as falling into two categories: positive and negative. . . . The positive symptoms include distortions in thought content (delusions), perception (hallucinations), language and thought process (disorganized speech), and self-monitoring of behavior (grossly disorganized or catatonic behavior). Negative symptoms include restrictions in the range and intensity of emotional expression (affective flattening), in the fluency and productivity of thought and speech (alogia), and the initiation of goal-directed behavior (avolition)." (Br. 2 (quoting DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 298 (4th ed. 2000).)

*B. Summary of Relevant Medical Evidence*

In April 2002, Minniefield was hospitalized at the Great Lakes Naval Hospital while suffering from paranoia and disorganized thoughts. (Tr. 460.) He reported serving one tour in the Marine Corps and that he had recently enlisted in the Navy. (Tr. 460.) He was diagnosed with paranoid schizophrenia and assigned a Global Assessment of Functioning ("GAF") Score of 30 on admission and 55 on discharge.[4] (Tr. 456.) As a result of his diagnosis, Minniefield was later separated from the Navy. (Tr. 456.)

In July 2002, Minniefield sought treatment at the Marion, Indiana Veteran's Administration Medical Center ("VAMC") mental health clinic and indicated that he did not accept his diagnosis and was not taking his medication. (Tr. 131-32.) In August 2002, Minniefield returned to the mental health clinic. Dr. Arturo Tecson diagnosed Minniefield with adjustment disorder; ruled out schizophrenia, simple; and assigned a GAF Score of 70. (Tr. 134.) Minniefield was seen again at the clinic in March 2003 and Dr. Tecson diagnosed him with adjustment disorder NOS; a history of schizophrenia, residual; and a personality disorder NOS and assigned him a GAF Score of 72. (Tr. 124-25, 135-36.)

On May 9, 2003, Minniefield's father took him to the VAMC clinic after the police found him wandering the streets with no identification. (Tr. 137.) Dr. Tecson found that Minniefield's insight and judgment were very poor; diagnosed him with chronic schizophrenia, undifferentiated with depression; and a personality disorder NOS. (Tr. 137.) Dr. Tecson

---

[4] A GAF score measures a clinician's judgment of the individual's overall level of psychological, social, and occupational functioning. *See* Diagnostic & Statistical Manual of Mental Disorders - Text Revision 32 (4th ed. 2000). The higher the GAF score, the better the individual's psychological, social, and occupational functioning. A GAF score of 21-30 is indicative of an individual whose behavior is considerably influenced by delusions or hallucinations and has serious impairments in communication or judgment and a GAF Score of 51-60 is indicative of an individual who has moderate symptoms or any moderate impairments in social, occupational, or school functioning.

assigned a GAF Score of 60. (Tr. 137.)

On May 15, 2003, Dr. Thomas Vodde evaluated Minniefield and noted that he had not been complying with his medication and that he had poor insight into his psychological functioning. (Tr. 124.) Dr. Vodde diagnosed him with paranoid schizophrenia and assigned a GAF Score of 40. (Tr. 127.) Dr. Vodde also opined that Minniefield's functioning appeared to be extremely marginal and that he did not comply with his medication regimen. (Tr. 127.) He concluded that Minniefield was unable to secure or maintain competitive employment. (Tr. 127.)

Minniefield returned to the VAMC clinic on May 22, 2003 to undergo an initial mental health assessment. (Tr. 138-39.) He indicated that he was interested in drug counseling and stated that he smoked marijuana one or two times a week and drank alcohol socially. (Tr. 138-39.) He also reported that he had begun taking methamphetamine but was also taking his prescribed medication. (Tr. 138-39, 144-45.) Dr. Tecson assigned a GAF Score of 65 and diagnosed Minniefield with schizophrenia, paranoid, residual; adjustment disorder with depression; and personality disorder NOS. (Tr. 145.) On that same day, Minniefield attended a chemical dependence intake interview and was diagnosed with mixed substance abuse. (Tr. 145-46.)

On August 27, 2003, Dr. Sherwin Kepes performed a consultative examination of Minniefield. The claimant reported that he was living with a friend, was taking his prescribed medication, and that he drank alcohol once a week and did not use illegal drugs. Dr. Kepes found that Minniefield did not display any significant difficulty with cognitive functioning and that he seemed somewhat stabilized on medication. (Tr. 158-59.) Dr. Kepes diagnosed Minniefield with paranoid schizophrenia and assigned him a GAF Score of 60. (Tr. 160-61.)

4

In September 2003, Dr. W. Shipley completed a Psychiatric Review Technique Form and found that Minniefield's paranoid schizophrenia was not severe because it was apparently stabilized with treatment. (Tr. 162-74.) Dr. Shipley found that Minniefield was only mildly limited in each of the "B" criteria of the applicable disability listings. (Tr. 162-74.) That same month, Minniefield was evaluated by Caroline Voors, a clinical psychiatric nurse, who assigned him a GAF Score of 60. Minniefield reported that he was only taking his medications every other night. (Tr. 324.)

Minniefield saw Dr. Jerome Massenburg, a psychiatrist at the VAMC mental health clinic, beginning in January of 2004. He diagnosed Minniefield with paranoid schizophrenia, a history of cannabis abuse, and mixed personality disorder and assigned a GAF Score of 65. (Tr. 289-92.) In March 2004, Minniefield was again seen by Dr. Massenburg, who maintained his previous diagnosis and GAF Score. (Tr. 288.)

From June 27 to June 29, 2004, Minniefield was admitted to impatient treatment at the Fort Wayne, Indiana VAMC because of his violent behavior and a suspected arson (he set fire to a piece of his girlfriend's clothing). (Tr. 185-90.) Minniefield had not been complying with his mental health treatment regimen and had been abusing marijuana, cocaine, and alcohol. (Tr. 185-90.) At admission, Minniefield admitted that he had used marijuana and cocaine four times in the past four months, although tests performed on him indicated that he was using drugs more frequently than he was willing to admit. (Tr. 185-86, 194-95.) At admission, Minniefield was assigned a GAF Score of 25 and was assigned a GAF Score of 51 upon discharge. (Tr. 185-86.)

Minniefield was transferred to the Marion, Indiana VAMC inpatient psychiatric unit on June 30, 2004. Dr. Shivanna Kumar diagnosed him with an acute exacerbation of chronic

5

paranoid schizophrenia, cannabis abuse, cocaine abuse, and alcohol abuse and assigned a GAF Score of 40 at admission and 55 for the past year. (Tr. 379-83.) Dr. Kumar stated that Minniefield's use of cocaine and marijuana had markedly increased in the past year and that he was abusing drugs on an almost regular basis at the time of his admission. (Tr. 380-82.) Minniefield was discharged on July 22, 2004 and assigned a GAF Score of 51. He was prescribed injections of Risperidone Consta every two weeks to treat his schizophrenia. Dr. Kumar noted that Minniefield was initially unreceptive to his treatment but eventually agreed to the bi-weekly injections and to follow outpatient substance abuse counseling after his discharge. (Tr. 188-89.) Dr. Kumar's prognosis for Minniefield upon his discharge was guarded in view of his "noncompliance with substance abuse programs and chronic mental illness," although Dr. Kumar indicated that his prognosis could change if Minniefield kept up his medical and substance abuse treatments. (Tr. 574.)

From July 2004 to September 2005, Minniefield's case managers reported that he was generally compliant with his medication, receiving Risperidone Consta injections every two weeks, and was experiencing no side effects. (Tr. 735-42, 745-60, 768-75.) However, Dr. Wayne von Bargen performed a consultative exam on Minniefield on September 7, 2004 and diagnosed him with paranoid schizophrenia, currently improving with treatment; alcohol abuse; cocaine abuse, in early remission; and cannabis abuse, in early remission. (Tr. 426.) Dr. von Bargen noted that Minniefield's compliance with treatment was erratic and that a recent hospitalization was apparently due to his having stopped taking his medication and his drug use. (Tr. 426.) He found that Minniefield could apparently perform his routine daily activities and care for himself, but his symptoms might be exacerbated by periods of increased emotional

6

distress. (Tr. 426.)

Minniefield was diagnosed with paranoid schizophrenia and substance abuse disorder by Dr. Kenneth Neville on October 20, 2004. He found that Minniefield had mild limitations in his activities of daily living and in maintaining social functioning and had moderate limitations in maintaining concentration, persistence, and pace. (Tr. 437, 443-44.) He also found that if Minniefield was compliant with his treatment program and did not abuse drugs, he could carry out simple, repetitive tasks. (Tr. 445.)

Minniefield regularly returned to see Dr. Massenburg throughout 2005. In February 2005, he reported improved mental functioning, relative stability, and no side effects from his medication. (Tr. 749.) Dr. Massenburg noted that Minniefield showed a relatively stable mood, fair cognitive functioning, and adequate judgment. (Tr. 749.) He diagnosed Minniefield with chronic paranoid schizophrenia; a prior history of alcohol and marijuana abuse; and mixed personality traits. (Tr. 749.) Minniefield was assigned a GAF Score of 65 and continued to take his Risperidone Consta injections. (Tr. 749.)

On March 1, 2005, the Department of Veteran Affairs approved Minniefield for 100% compensation benefits because of his paranoid schizophrenia. (Tr. 451-53, 535-36.) In making its determination, the Department relied on Dr. Vodde's May 2003 finding that Minniefield was unable to obtain and maintain competitive employment. (Tr. 451-53, 535-36.) The Department noted that Minniefield did improve with treatment and that therefore its determination was not permanent and would be re-evaluated at a later date. (Tr. 451.)

Minniefield was admitted to the Fort Wayne, Indiana VAMC's mental health unit under an emergency detention order on October 29, 2005. He had gotten into a fight with a man he

7

suspected was also seeing his girlfriend and had to be brought to the emergency room to have his lip sutured. (Tr. 568.) He was then brought to the hospital's mental health center. He tested positive for cocaine and marijuana and acknowledged that he had been under the influence at the time of the incident. (Tr. 673.) Minniefield acknowledged his substance abuse and agreed to attend an outpatient treatment program. (Tr. 652.) Dr. Escolastico Deloria diagnosed him with chronic paranoid schizophrenia, alcohol abuse, crack cocaine dependency, and marijuana dependency and assigned him a GAF Score of 80 upon discharge. (Tr. 568.)

On November 10, 2005, Minniefield was again seen at the Fort Wayne VAMC and reported to a substance abuse counselor that he had been regularly using alcohol, marijuana, and crack cocaine. (Tr. 640.) His diagnosis of paranoid schizophrenia was maintained and he was assigned a GAF Score of 65. (Tr. 641-43.) Minniefield also saw Dr. Manoj Suryawala, who noted that he showed logical, coherent thought processes with no signs of paranoia. He was diagnosed with paranoid schizophrenia, alcohol abuse, cocaine dependency, and cannabis dependency and assigned a GAF Score of 55. (Tr. 638-39.)

From November 2005 to July 2006, Minniefield reported to his case managers that he was compliant with his medication and was not abusing drugs or alcohol. (Tr. 595-638.) Minniefield's records from that period, however, indicate that he was frequently out of compliance with his treatment and still regularly abusing drugs and alcohol. (Tr. 595-638.)

Minniefield saw Dr. Massenburg again in December of 2005. He reported that his October 2005 hospitalization followed a one month period of frequent cocaine, marijuana, and alcohol abuse and several missed Risperidone Consta injections. (Tr. 632.) Dr. Massenburg noted that Minniefield was exhibiting a depressed mood, paranoid ideation, fair cognitive

8

functions, and adequate judgment. (Tr. 632.) He diagnosed Minniefield with chronic paranoid schizophrenia, cocaine abuse, alcohol abuse, cannabis abuse, and a personality disorder NOS. (Tr. 633.) Dr. Massenburg continued Minniefield on the bi-weekly Risperidone Consta injections, strongly recommended that he stop his substance abuse, and assigned a GAF Score of 60. (Tr. 633.)

Minniefield again saw Dr. Massenburg in March 2006 and reported a stable mood. (Tr. 616.) Dr. Massenburg noted that Minniefield showed acceptable cognitive functions and adequate judgment. (Tr. 616.) He diagnosed Minniefield with paranoid schizophrenia, alcohol and cannabis abuse, and a mixed personality disorder. (Tr. 617.) He ordered Minniefield to continue his medication and assigned a GAF Score of 67. (Tr. 617.)

## C. Minniefield's Hearing Testimony

On December 14, 2006, Minniefield appeared with counsel and testified before Administrative Law Judge Bryan Bernstein. (Tr. 785-813.) Minniefield began his testimony by recounting his diagnosis of paranoid schizophrenia and detailing his treatment. (Tr. 790-92.) He testified that he is not currently taking any illegal drugs and that he last used marijuana a year to six months prior to the hearing and cocaine two to three years prior. (Tr. 792-93.) He then described his daily activities, such as cooking, cleaning, going to his lawyer's office, and visiting relatives. (Tr. 793-94.)

Minniefield's fiancé, Ms. Harriet Angela Jones, also testified. She stated that she had been living with Minniefield for three and a half years. (Tr. 804.) She testified that he frequently exhibits irrational and strange behavior a few times per week, such as putting on his military uniform and believing that he is still on duty. (Tr. 805-7.) She also testified that his personality

9

often dramatically changes and he can suddenly become an entirely different person. (Tr. 805-7.)

Finally, Mr. Charles McBee, the Vocational Expert ("VE") testified about what types of work Minniefield may be able to carry out. (Tr. 807-12.) The ALJ asked the VE to consider an individual who is unable to do work that requires a close regimentation of production; close regimentation of work activity as a consequence of certain operational demands for functioning within close tolerances; functioning at an unusually rapid level of productivity; and intense contact with the public or strangers. (Tr. 807-8.) The VE testified that Minniefield would likely be unable to perform his past relevant work as a prep cook or in assembly production. (Tr. 808.) He testified that Minniefield would be able to perform his past relevant work as material handler, forklift operator, and tractor trailer driver. (Tr. 808-9.) The VE testified that there is no exertional level and that Minniefield could find work as a commercial cleaner (1500 to 2000 jobs in the relevant region), a day worker (100 to 150 jobs), or a hand packager (500 to 750 jobs). (Tr. 809.)

## III. STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted). The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d

863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.* Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003). Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Clifford*, 227 F.3d at 869.

## IV. ANALYSIS

### A. *The Law*

Under the Act, a claimant is entitled to DIB if he establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform his past work; and (5)

whether the claimant is incapable of performing work in the national economy.[5] *See* 20 C.F.R. § 404.1520; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id*. The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868.

However, a claimant must be found to be not disabled if his drug or alcohol abuse is a "contributing factor material to the Commissioner's determination that the individual is disabled." 42 U.S.C. § 423(d)(2)(C); 20 C.F.R. § 404.1535(a); *Williams v. Astrue*, No. 1:06-cv-1444, 2007 WL 2362978, at *5 (S.D. Ind. Aug 13, 2007). In such cases, the ALJ first makes his disability determination under the five step process. 20 C.F.R. § 404.1535(b); *Sparks v. Astrue*, No. 3:08-cv-210, 2009 WL 2914106, at *6 (N.D. Ind. Sep. 3, 2009). If the ALJ finds that the claimant is disabled, he must next decide which of the claimant's limitations would remain absent the substance abuse. 20 C.F.R. § 404.1535(b). The ALJ must then determine which, if any, of the remaining limitations would be disabling on their own. *Id*.; *Kangail v. Barnhart*, 454 F.3d 627, 628 (7th Cir. 2006) ("When an applicant for disability benefits has both a potentially disabling illness and is a substance abuser, the issue for the [ALJ] is whether, were the applicant not a substance abuser, [he] would still be disabled.").

---

[5] Before performing steps four and five, the ALJ must determine the claimant's Residual Functional Capacity ("RFC")—what tasks the claimant can do despite his limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. §§ 404.1520(e).

### B. *The ALJ's Decision*

On June 14, 2007, the ALJ rendered his opinion. (Tr. 18-29.) He found at step one of the five-step analysis that Minniefield had not engaged in substantial gainful activity since his alleged onset date. (Tr. 21.) At step two, he determined that Minniefield was suffering from severe impairments. (Tr. 21.) At step three, he determined that Minniefield's impairments, when considered together with his substance abuse, were severe enough to meet a listing, but that when Minniefield stopped his substance abuse, he no longer had any impairments that met or equaled that listing. (Tr. 21-22.) Before proceeding to step four, the ALJ determined that Minniefield had the following RFC:

> When the claimant stopped substance abuse, the claimant has the residual functional capacity to perform a restricted range of work activity. Specifically, the claimant is not able to perform work that imposes close regimentation of production. Close regimentation of work activity is a consequence of certain operational demands for functioning within close tolerances or for an unusually rapid level of productivity. This might be required when there is a high value placed on product quality, the raw materials, the equipment employed, or coordination with others and the pace of production. Close and critical supervision in this context would produce unacceptable distress.
>
> This individual is also unable to address work that imposes intense contact with the public or strangers. Such a position exposes a person to the emotional challenges of strangers who may have a personal response that disturbs sensitive employees. Customers with emergencies or extreme dissatisfaction with service or products can display emotions that make public contact too uncomfortable for the claimant.

(Tr. 24-25.)

Based on this RFC and the VE's testimony, the ALJ concluded at step four that without considering limitations from his substance abuse, Minniefield could perform his past relevant work as a loader, forklift operator, and tractor trailer driver, but could not return to his past work as a prep cook. (Tr. 28-29.) At step five, he concluded that there are a significant number of jobs

13

in the national economy that Minniefield could perform, such as a commercial cleaner (1500 to 2000 jobs in the applicable region), a day worker (100 to 150 jobs), and a hand packager (500 to 750 jobs). (Tr. 28.) The ALJ therefore concluded that because Minniefield's substance abuse was a contributing factor material to his disability, he was not disabled within the meaning of the Social Security Act and his claim for DIB was denied. (Tr. 29.)

### *C. The ALJ Erred in Evaluating Minniefield's Mental RFC.*

Minniefield offers several theories on how the ALJ erred when determining his RFC. While Minniefield's arguments are largely cursory and not well developed, at least one of his contentions has merit and warrants a remand of the Commissioner's final decision. Minniefield argues, among other things, that the ALJ erred when determining his RFC by failing to consider whether his mental illness prevented him from taking his prescribed medications or otherwise submitting to treatment. (Br. 10.) Specifically, Minniefield points to several pieces of medical evidence that he believes suggest that his failure to always be compliant with his treatment regime was influenced by his mental illness.

The RFC is a determination of the tasks a claimant can do despite his limitations. *See* SSR 82-62. While the RFC can be expressed in terms of exertional categories such as "light", medium", or "heavy", the ALJ must first make a more detailed function-by-function assessment of the claimant's current physical and mental abilities. SSR 96-8p. The RFC assessment "is based upon consideration of all relevant evidence in the case record, including medical evidence and relevant non-medical evidence, such as observations [by] a lay witness of an individual's apparent symptomology, an individual's own statement of what he or she is able or unable to do, and many other factors that could help the adjudicator determine the most reasonable findings in

light of all the evidence." SSR 96-5p; *see* 20 C.F.R. §§ 404.1545, 416.945. In doing so, an ALJ must consider the combined effect of a claimant's severe and non-severe impairments when assigning an RFC. *See* 20 C.F.R. §§ 404.1523, 416.923; *Gentle v. Barnhart*, 430 F.3d 865, 868 (7th Cir. 2005); *Barrett v. Barnhart*, 355 F.3d 1065, 1068 (7th Cir. 2004); *Clifford*, 227 F.3d at 873 (7th Cir. 2000); *Green v. Apfel*, 204 F.3d 780, 782 (7th Cir. 2000).

Additionally, if the ALJ assigns weight to the fact that the claimant did not follow a prescribed treatment regime, he must consider the claimant's explanations, such as financial hardship or medication side effects. 20 C.F.R. § 404.1529; SSR 96-7p; *Craft v. Astrue*, 539 F.3d 668, 678-79 (7th Cir. 2008) (ALJ erred where she "drew a negative inference as to [the claimant's] credibility from his lack of medical care, [but] she neither questioned him about his lack of treatment or medicine noncompliance during that period, nor did she note that a number of medical records reflected that [the claimant] had reported an inability to pay for regular treatment and medicine.").

The Seventh Circuit Court of Appeals has also held that in cases of mental illness, the ALJ commits error if he does not even consider the possibility that a claimant's illness was a potential cause of his failure to seek or continue treatment. *Kangail v. Barnhart*, 454 F.3d 627, 630-31 (7th Cir. 2006) (ALJ erred by not considering that claimant's bipolar disorder may have prevented medication compliance); *Peevy v. Astrue*, 1:08-cv-111, 2009 WL 721680, at *8 (N.D. Ind. Mar. 18, 2009) (same). Nevertheless, the ALJ's opinion must merely articulate his analysis of the evidence "to . . . a minimum level." *Ray v. Bowen*, 843 F.2d 998, 1002 (7th Cir. 1988); *Ottman v. Barnhart*, 306 F. Supp. 2d 829, 838 (N.D. Ind. 2004).

In the present case, the ALJ initially found that Minniefield's severe impairments of

15

paranoid schizophrenia and substance addiction disorder rendered him disabled. (Tr. 21.) However, the ALJ found that his substance abuse was a contributing factor material to his disability, and that, absent his substance abuse, Minniefield's condition did not warrant a disability listing. (Tr. 23.) In making this determination, the ALJ frequently cited Minniefield's non-compliance with his treatment regime. However, the ALJ failed to consider any possible reasons for this failure (Tr. 23-26) and Minniefield now claims that this was reversible error.

Minniefield's argument, however bare, has merit. If the ALJ takes a claimant's failure to follow treatment into consideration, he must also consider any reasons for this non-compliance. 20 C.F.R. § 404.1529; SSR 96-7p; *Craft*, 539 F.3d at 678-79. For example, in finding that Minniefield was not disabled absent his substance abuse, the ALJ noted that: "His paranoid schizophrenia symptoms were exacerbated by both polysubstance abuse and lack of medication compliance . . .." (Tr. 23.) Similarly, the ALJ considered that "when the claimant is compliant with medication . . . his paranoid schizophrenia symptoms decrease dramatically and his functioning significantly increases." (Tr. 25.) Finally, the ALJ noted that: "The claimant's rapid decompensation when he stopped his medication in October 2005, used drugs/alcohol, and required a seventy-two hour hold, demonstrates the importance of medication compliance and sobriety for the claimant to effectively manage his paranoid schizophrenia symptoms." (Tr. 26.)

However, the ALJ failed to consider any possible reasons for why Minniefield may have not been compliant with his treatment. Minniefield points to several pieces of evidence that he believes show that his mental illness played a role in his failure to follow his required treatment. For example, he claims that "Dr. Vodde found that he was non-compliant with his medication regimen . . . mainly out of an apparent unacceptance [sic] of having any psychological or

16

psychiatric problems." (Br. 10.) Similarly, Minniefield argues that "[h]is Paxil was stopped in view of his paranoid ideations and perceptual distortions" and "[h]e was overwhelmed by the fact that he had to take medication for the rest of his life." (Br. 10.) Finally, Minniefield argues that the ALJ erred by overlooking Dr. Kumar's notation that he was "paranoid about taking medications." (Br. 10.)

Minniefield's argument that the ALJ erred by apparently not considering the possibility that his mental illness interfered with his treatment compliance is therefore correct. Although the ALJ is only required to articulate his analysis of the evidence to a minimum level, *Ray,* 843 F.2d at 1002, failure to even consider explanations for treatment non-compliance is error. *Kangail*, 454 F.3d at 630-31. Indeed, the ALJ's opinion frequently mentions Minniefield's failure to be compliant with his treatment regimen but does not consider the possible reasons for this failure. Accordingly, his decision cannot be said to be based on substantial evidence, *Clifford*, 227 F.3d at 869, and this case must be remanded for the ALJ to consider the possible reasons for Minniefield's treatment non-compliance.

In sum, the Court finds that the ALJ committed error when evaluating Minniefield's mental RFC. Although the ALJ is only required to articulate his analysis of the evidence "to . . . a minimum level," *Ray,* 843 F.2d at 1002, his failure to even acknowledge the possibility that Minniefield's mental illness was a contributing factor to his treatment non-compliance was error. *Craft*, 539 F.3d at 678-79. Accordingly, this case must be remanded for the ALJ to consider the impact of Minniefield's mental illness.

## V. CONCLUSION

For the reasons articulated herein, the decision of the Commissioner is REVERSED and

this case is REMANDED so that the ALJ may specifically consider the impact of Minniefield's mental illness on his failure to comply with his treatment. The Clerk is directed to enter a judgment in favor of Minniefield and against the Commissioner.

SO ORDERED.

Enter for January 12, 2009.

S/Roger B. Cosbey  
Roger B. Cosbey,  
United States Magistrate Judge